IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LARRY R. DEAN,

                    Plaintiff,

          v.                                        Civil Action No. 2:05-CV-85

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY


### I.  Introduction

A.    Background

       Plaintiff, Larry R. Dean, (Claimant), filed his Complaint on November 15, 2005, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on January

23, 2006.[2]   Claimant filed his Motion for Summary Judgment on March 24, 2006.[3]

Commissioner filed her Motion for Summary Judgment on June 6, 2006.[4]

B.    The Pleadings

          1.    Claimant's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 10.

[4] Docket No. 16.

2.     <u>Commissioner's Motion for Summary Judgment</u>.[5]

C.     <u>Recommendation</u>

I recommend that:

1.     Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner so she may properly evaluate Claimant's alleged acute psychotic disorder and borderline intellectual functioning in accord with 20 C.F.R. § 404.1520a.

2.     Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.


## II. Facts

A.     <u>Procedural History</u>

Claimant filed his first application for Social Security Disability Insurance Benefits on February 17, 1999, alleging disability since August 15, 1998. The application was denied and initially and on reconsideration. Claimant did not request review by an ALJ. Claimant then filed a second application on March 11, 2002, alleging disability since March 8, 2002. This application was also denied initially and on reconsideration. Claimant requested review by an ALJ and received a hearing before an ALJ on September 23, 2003. The ALJ ruled against Claimant on November 19, 2003. Claimant filed a request for review from the Appeals Council,

---

[5] Claimant's counsel is reminded the Northern District of West Virginia limits briefs in Social Security cases to fifteen pages, except as otherwise provided by the Court upon motion. L.R. Gen. P. 83.12(d). Claimant's brief is twenty two pages long. The record does not indicate Claimant received permission to file a brief exceeding the page limits. While the Court will consider all Claimant's arguments in this case, his counsel is informed that in the future, arguments on pages exceeding the page limits may not be considered.

but it denied this request on August 4, 2004.  The Appeals Council considered a second time

whether to review Claimant's case, but denied review again on October 7, 2005.  This action was

filed and proceeded as set forth above.

B.    Personal History

Claimant was 54 years old on the date of the September 23, 2003 hearing before the ALJ.

Claimant has a high school education. Claimant has prior relevant work experience as a truck

driver and laborer for a paving company.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: March 8, 2002–November 19, 2003.[6]

**Robert L. Williams, M.A., 10/2/02, Tr. 187**
IQ test: 68
The Claimant performed at the first percentile in motor dexterity with both his right and left
hands.

**Workers' Compensation Division, 8/21/98, Tr. 195**
(first page is illegible)

Motor Strength
Hip flexion, hip extension, hip abduction, knee extension, knee flexion, ankle
dorsiflexion, ankle planter flexion, great toe extension, heel toe walk, toe walk: normal

Sensory
L3 sensory (left and right), L4 sensory (left and right), L5 sensory (left and right), S1
sensory (left and right): normal

---

[6] Much of the evidence in the record comes from before Claimant's alleged onset date of
disability.  Commissioner asserts this evidence is relevant "for background purposes only."
Def.'s Br. at 2.  Evidence obtained prior to the alleged onset date may be relevant to the instant
claim.  See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7
F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y.
2004).

Reflexes
Patellar (left and right), achilles (left and right): +2

Straight leg raising
No left pain or right pain

Pedispulses
(Illegible): normal
(Illegible): normal

Leg length exam: left leg is shorter by .4 cm

Sensory examination:
Response to pinprick: no deficit or deficit well localized to dermatomes
Amount of body involved: less than 15 percent

Motor examinations
No deficit or deficit well localized to myotomes
Amount of body involved: less than 15 percent

Tenderness
No tenderness or tenderness clearly localized to discrete, anatomically sensible structure
Amount of body involved: less than 15 percent

Differential straight leg raising
The difference between SLR tests performed in the supine and sitting positions (the patient is distracted in the sitting position by examining the bottom of his feet). Example: supine SLR positive at 10 degrees, seated SLR positive at 50 degrees, difference = 40 degrees. Difference: less than 20.

Diagnosis: herniated lumbar disc, L3, L4-5, (illegible)

Soft tissue: lumbrosacral sprain/strain

Posterior joints: lumbar subluxation or lumbar segmented by dysfunction

Disc: lumbar disc displacement with radiculopathy

Sacroiliac: sacroiliac subluxation or sacroiliac segmental dysfunction

**Robert C. Byrd Clinic, 8/6/98, Tr. 205**
Postural study: right leg 4 mm longer than left, left sacral base 4 mm higher than right, sacral base angle of 30 degrees, lumbrosacral angle of 160 degrees, vertical line dropped from mid-body transects mid and anterior 1/3 of S1, dextroscoliosis of 4 degrees.

Thoracic spine: mild levoscoliosis, minimal spurring/spondylosis

**Greennbrier Valley Medical Center, 8/17/98, Tr. 206**
There is mild to moderate broad disc bulging. There is mild thickening of the ligamentum flavum and these changes combine to cause mild spinal stenosis. At the L4-5 level, there is mild to moderate broad disc bulging. There is mild thickening of the ligamentum flavum and these changes again combine to cause mild spinal stenosis at this level. The disc bulging causes mild impression on both L5 nerve roots. At the L5-S1 level there is a moderate amount of gas in the disc secondary to degenerative disc disease. This is mild broad disc bulging.

**M. Khalid Hasan, M.D., 1/16/99, Tr. 208**
Diagnosis: acute paranoid psychosis

**M. Khalid Hasan, M.D., 1/13/99, Tr. 210**
Assessment:
　　　　Axis I: acute paranoid psychosis
　　　　Axis II: no diagnosis
　　　　Axis III: history of back injury, history of fracture to left ankle, history of trauma to right
jaw
　　　　Axis IV: deferred
　　　　Axis V: GAF of 45

**M. Khalid Hasan, M.D., 1/13/99, Tr. 214**
Diagnosis:
　　　　Axis I: acute paranoid psychosis
　　　　Axis II: none
　　　　Axis III: chronic pain syndrome, status post back injury, history of fracture of the left
ankle with pins, status post injury to the jaw with plate following a motor vehicle accident

**K. Hasan, M.D., 1/14/99, Tr. 216**
Impression: normal chest

**James D. Weinstein, M.D., 1/28/99, Tr. 218**
Diagnosis: chronic lumbar strain and sprain syndrome

**James D. Weinstein, M.D., 11/23/98, Tr. 219**
The patient suffers from mild spinal stenosis at the 3-4 level and a disc bulge at the 4-5 level

**James D. Weinstein, M.D., 11/5/98, Tr. 220**
There is mild spinal stenosis at the 3-4 level and disc bulge at the 4-5 level

**James D. Weinstein, M.D., 1/21/99, Tr. 221**
Impression: multilevel degenerative disc disease with multiple disc protrusions. No specific

nerve root impingement is detected.

**James D. Weinstein, M.D., 1/21/99, Tr. 222**
Impression: degenerative disc disease with disc protrusions at L3-4, L4-5, and L5-S1. No nerve root impingement is identified

**Sang K. Kim, M.D., 2/23/99, Tr. 224**
Impression: essentially negative chest

**Physical Residual Functional Capacity Assessment, 2/23/99, Tr. 225**
Exertional limitations
       Occasionally lift and/or carry 50 pounds
       Frequently lift and/or carry 25 pounds
       Stand and/or walk for a total of about 6 hours in an 8 hour workday
       Sit for a total of 6 hours in an 8 hour workday
       Push and/or pull: unlimited

Postural limitations
       Climbing, stooping: occasionally
       Balancing, kneeling, crouching, crawling: frequently

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
       Extreme heat, extreme cold, hazards: avoid concentrated exposure
       Wetness, humidity, noise, vibration, fumes, odors, gases, poor ventilation: unlimited

**A.E. Landis, M.D., 5/5/99, Tr. 237**
Diagnosis: degenerative changes in lumbar spine
Impression: strain/sprain to lower back

**A.E. Landis, M.D., 12/24/98, Tr. 240**
Diagnosis: normal x-rays of right hand, moderate degenerative disc disease L5-S1
Impression: soft tissue strain/sprain to the lower back

**Workers' Compensation Division, 12/14/98, Tr. 245**
Palpitation
       Vertebral tenderness/restriction, coccyx tenderness, paraspinal muscle tenderness (left and right), paraspinal muscle spasms (left and right), sacroiliac joint tenderness (left and right): no
       Sacral base and pelvis level: yes

Gait: no limp
Squat
        Squats fully and rises without difficulty: no

Sensory examination: response to pinprick
        No deficit or deficik well related to dermatomes
        Amount of body involved: less than 15 percent

Motor examinations
        No deficit or deficit well localized to myotomes
        Amount of body involved: less than 15 percent

Tenderness
        No tenderness or tenderness localized to anatomically sensible structure
        Amount of body involved: less than percent

Differential straight leg raising
        The difference between SLR tests performed in the supine and sitting positions.
Difference: less than 20 percent

Diagnosis: lumbrosacral sprain/strain

Motor strength
        Hip flexion, hip extension, hip abduction, knee extension, knee flexion, ankle
dorsiflexion, ankle planter flexion, great toe extension, heel toe walk, toe walk: normal

Sensory
        L3 sensory (left and right), L4 sensory (left and right), L5 sensory (left and right), S1
sensory (left and right): normal

Reflexes
        Patellar (left and right), achilles (left and right): +1

**Laurence I. Kleiner, M.D., 6/3/99, Tr. 250**
There is disc bulging at 3-4 and 4-5, as well as mild stenotic changes at 4-5.

**Laurence I. Kleiner, M.D., 5/18/99, Tr. 251**
There is preservation of the normal lumbar lordosis and collapse of the L5-S1 disc space. There
are no lytic of blastic lesions. There is a vacuum phenomena of the disc at L5-S1, and
delineation of the interspinal nerve root sacs and nerve root seems good at the level of L5-S1, but
becomes too artifactual to delineate soon afterwards.

**Ventilatory Function Report, 9/99/99, Tr. 253**
Interpretation: moderate restrictive pulmonary disease

**Eli Rubenstein, M.D., 9/16/99, Tr. 254**
Impression: COPD

**Physical Residual Functional Capacity Assessment, 7/12/99, Tr. 257**
Exertional limitations
      Occasionally lift and/or carry 50 pounds
      Frequently lift and/or carry 25 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour workday
      Sit for a total of about 6 hours in an 8 hour workday
      Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations: none established, except to avoid concentrated exposure to fumes, odors, gases, and poor ventilation

**Psychiatric Review Technique, 4/1/99, Tr. 265**
Medical summary: impairments not severe
Category upon which disposition is based: 12.03 schizophrenia, paranoid and other psychotic disorders

Organic mental disorders: no evidence

Schizophrenia, paranoid, and other psychotic disorders
      The patient has psychotic features and deterioration that are persistent, as evidenced by at least one of the following:
      Delusions or hallucinations, catatonic or other grossly disorganized behavior, incoherence, loosening of associations, illogical thinking, or poverty o f content of speech if associated with blunt affect, flat affect, or inappropriate affect, emotional withdrawal and/or isolation: absent
      (Illegible): present

Affective disorders: no evidence
Mental retardation and autism: no evidence
Anxiety related disorders: no evidence
Somatoform disorders: no evidence
Personality disorders: no evidence
Substance addiction disorders: absent

Rating of impairment severity
      Restriction of activities of daily living, difficulties in maintaining social functioning:

slight

　　Deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner: seldom

　　Episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation or signs and symptoms: once or twice

**Physical Residual Functional Capacity Assessment, 5/29/02, Tr. 274**
Exertional limitations
　　Occasionally lift and/or carry 20 pounds
　　Frequently lift and/or carry 10 pounds
　　Stand and/or walk about 6 hours in an 8 hour workday
　　Sit for a total of about 6 hours in an 8 hour workday
　　Push and/or pull: unlimited

Postural limitations
　　Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Louis B. Kastan, M.D., 7/30/02, Tr. 282**
Impression: mild osteoarthritis, straightening of the lordotic curvature, narrowing of the C5-C6 and C6-C7 disc spaces, encroachment C5-C6 foramen bilaterally and the C6-C7 foramina on the left, restricted motion on the lateral bending bilaterally, on rotation to the right and at the C5-C7 on the flexion and extension

**Louis B. Kastan, M.D., 5/14/02, Tr. 283**
 Impression: minimal to mild osteoarthritis, narrowing of the L5-S1 disc space, dextro-scoliosis, negative dynamic motion x-ray of the lumbar spine

**John C. Sharp, D.O., 9/4/02, Tr. 285**
The patient suffers from the inability to sit, bend, carry, walk, difficulty turning his head, difficulty chewing, and (illegible).  He has a limp.  These impairments are consistent with clinical findings.

The patient would not be capable of walking and standing most of the time and lifting 50 pounds frequently and 100 pounds occasionally.
The patient would not be capable of walking and standing most of the time and lifting 25 pounds frequently and 50 pounds occasionally.
The patient would not be capable of doing a significant amount of walking and standing and lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time

pushing and pulling.

The patient would not be capable of sitting most of the time, walking and standing occasionally, and lifting no more than 10 pounds.

The patient would be capable of sitting 30 minutes per hour and 2 hours in an 8 hour day, walking 20 minutes per hour and 1 hour in an 8 hour day, and standing 20 minutes per hour and 1-2 hours in an 8 hour day.

The patient should never perform climbing, balancing, stooping, kneeling, crouching, crawling, or squatting. They patient should only infrequently perform bending. The patient may occasionally perform stretching and reaching.

The patient would suffer from jarring or vibrations, cold weather, fumes, dust, noises, and environmental hazards. He would not suffer from excessive humidity.

The patient could be expected to experience chronic mild to moderate and chronic moderate pain. The patient may experience intermittent severe pain.

### John C. Sharp, D.O., 9/4/02, Tr. 290

The patient has abnormal vision, hearing, speech, fait and station, fine motor ability, gross motor ability, joints, range of motion, reflexes, sensory deficits, motor strength, coordination, breath sounds, and dyspnea with exertion

The patient has normal muscle bulk, frequency of seizures, mental status, orthopnea, cyanosis, edeme, heart sounds, chest pain, congestive heart failure, extremities/circulation, abdomen, ascites, skin, genito-urinary system, and age appropriateness.

### John C. Sharp, D.O., 8/12/02, Tr. 294

The patient has injuries including inoperable herniated disc, sensory neuralgia, reduced ROM lumbar spine, and cervical spine (via DMX).

### John C. Sharp, D.O., 5/7/02, Tr. 297

The patient suffers from abnormal vision, hearing, gait and station, fine motor ability, gross motor ability, joints, range of motion, reflexes, and motor strength.

The patient has normal hearing, speech, muscle bulk, sensory deficits, coordination, frequency of seizures, mental status, breath sounds, dyspnea, orthopnea, cyanosis, edema, heart sounds, chest pain, congestive heart failure, extremities, abdomen, ascites, skin, genito-urinary system, and age appropriateness.

### Rodolfo Gobunsuy, M.D., 10/17/02, Tr. 321

Impression: coughing due to chronic dust exposure (occupational lung disease), no shortness of breath, degenerative arthritis of the lumbar spine, symptoms suggest degenerative disc disease, tender back, occasional numbness of the lugs

**Dean R. Ball, D.O., 10/17/02, Tr. 327**
Impression: no acute cardiopulmonary process.

**Kimberly D. Caudell, M.A. and Dale M. Rice, M.A., 10/31/02, Tr. 331**
Diagnostic impression:
Axis I: no diagnosis
Axis II: diagnosis deferred
Axis III: patient reports back problems, neck problems, arthritis, and breathing problems

**Physical Residual Functional Capacity Assessment, 11/27/02, Tr. 337**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk about 6 hours in an 8 hour workday
      Sit for a total of about 6 hours in an 8 hour workday
      Push and/or pull: unlimited

Postural limitations
      Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations:
      Extreme cold, extreme heat, wetness, humidity, noise, hazards: unlimited
      Vibration, fumes, odors, gases, poor ventilation: avoid concentrated exposure

**Psychiatric Review Technique, 12/4/02, Tr. 345**
The patient has no medically determinable impairments

**Christy D. Gallaher, M.A. and L. Andrew Steward, Ph.D., 3/6/03, Tr. 359**
Diagnostic impression:
      Axis I: pain disorder associated with both psychological factors and a general medical condition
      Axis II: borderline intellectual functioning
      Axis III: disc disease and arthritis by report of client
      Axis IV: occupational problems and issues related to the social environment

**Dr. Alex Ambroz, 9/19/03, Tr. 374**
The patient is not capable of walking and standing most of the time and lifting 50 pounds frequently and up to 100 pounds occasionally. The patient is not capable of walking and standing most of the time and lifting 25 pounds frequently and up to 50 pounds occasionally. The patient is not capable of a significant amount of walking and standing and lifting 10 pounds

frequently and up to 20 pounds occasionally, or sitting most of the time and pushing and pulling. The patient is not capable of sitting most of the time, walking and standing occasionally, and lifting no more than 10 pounds.

The patient is capable of sitting 15 minutes per hour and 2 hours per day in an 8 hour day. The patient is capable of walking 15 minutes at a time and 2 hours per day. The patient is capable of standing 10 minutes per hour and 2 hours per day.

The patient should never perform climbing, balancing, stooping, crouching, or crawling. The patient may infrequently perform reaching, squatting, and bending.

The patient has restrictions related to jarring and vibrations. There are no restrictions regarding excessive humidity, cold weather temperature, fumes, dust, noise, and environmental hazards.

The patient could be expected to experience chronic severe pain.

**Alex Ambroz, M.D., 9/18/03, Tr. 380**
Impression: chronic low back pain, osteoarthritis, lumbar disc disorder, borderline intelligence.

**James D. Weinstein, M.D., 1/21/99, Tr. 394**
Impression: degenerative disc disease with disc protrusions at L3-4, L4-5, and L5-S1. No nerve root impingement is identified.

**James D. Weinstein, M.D., 1/21/99, Tr. 395**
Impression: multilevel degenerative disc disease with multiple disc protrusions. No specific nerve root impingement is detected. CT is performed to follow and will be dictated separately.

D.     Testimonial Evidence

Testimony was taken at the September 24, 2003 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

ALJ          Why did you give up the other job?

CLMT         My back started hurting me quite a bit.

ALJ          When did you stop the other job sir?

CLMT         It was 2000, I think it was.

ALJ          Your back hurts?

CLMT        Yes.

ALJ        Who were you working for specifically?

CLMT        I worked for West Virginia Paving?

\*       \*       \*

ALJ        You stopped work with Virginia Paving or they wouldn't hire you back, it was related to the fact that you had a painful back and when you tried to go back and work again they wouldn't put you back on the job?

CLMT:        That's right sir.

\*       \*       \*

ALJ        Thank you sir.  Why did you leave the, are you gonna go back to the job this winter doing the shuttle?

CLMT        No because of my back give me too much trouble driving.

ALJ        Thank you.  You live by yourself?

CLMT        I've got a girl friend that lives with me.

ALJ        Thank you.  Two people in the house right?

CLMT        Yes sir.

\*       \*       \*

ALJ        What kind of vehicle do you drive sir?

CLMT        I've got a Chevrolet car, a Cavalier.

ALJ        Do any hunting?

CLMT        What was your question again sir?

ALJ        Do you hunt?

CLMT        I used to.

ALJ        When's the last time you went hunting?

CLMT        To Somersville (PHONETIC) to see my lawyer.

ALJ        Thank you.  Do you go to restaurants?

CLMT        Not too often.

ALJ        Mainly stay around your place?

CLMT        Yes sir.

ALJ        Thank you.  Does your girl friend work?

CLMT        No sir.

ALJ        Is she disabled?

CLMT        No sir.

ALJ        Thank you.  So you have no source of income right now?

CLMT        No sir.

*          *          *

ALJ        What's wrong with your left hand?

CLMT        It gets numb on me a lot of times at night.  My two fingers does.

ALJ        Are you right-handed?

CLMT        I'm right-handed sir.

ALJ        I'm sorry?

CLMT        I'm right-handed sir.

ALJ        Thank you.   Just a few more questions than you attorney will be taking over.  How far do you walk sir?  If you go for a walk how far do you go?

CLMT        I try to walk a quarter a mile a day sir.

ALJ         Is that under doctor's instructions?

CLMT        Yes sir.

ALJ         Let's say you just wanted to stand still in the yard and talk to somebody walking by, how long could you stand in one spot?

CLMT        Maybe five minutes, cause my back starts hurting.

ALJ         Is sitting okay?  Can you sit for a football game or a race or something?

CLMT        I can't sit very long either.

ALJ         Can you give me an approximate amount of time you can sit sir before you have to get up?

CLMT        Maybe ten minutes at the most sir.

ALJ         If you need to get up during this hearing sir, you should feel free to stand up.

CLMT        Okay sir.

ALJ         How many pounds can you lift up?

CLMT        Around 15 to 20.

                              *              *              *

ALJ         How about with other people in the community.   You're okay with them, you don't, you can talk with them, carry on a conversation, get by?

CLMT        Yeah I get along with people.


ALJ         And if you were in a fast food place or restaurant, people say hello and

good morning, and how's the weather, you're able to carry on a brief conversation with them?

CLMT        Yes sir.

ALJ         Thank you.  It seems to me your principal problem is the amount of pain you have, is that correct?

CLMT        That's correct sir.

ALJ         And you're right handed?

CLMT        Yes sir.

ALJ         Sometimes your left hand goes numb.

CLMT        Yes sir.

ALJ         Is that correct?

CLMT        Yes sir.

ALJ         Well how often does that happen sir?

CLMT        Every couple of days.

ALJ         Can you chop wood?

CLMT        Not too well.

ALJ         Do you fish?

CLMT        I used to.

ALJ         Do you do it anymore?

CLMT        I hardly ever go anymore.

ALJ         Can you cast, cast out a line?

CLMT        Yes sir.

ALJ         Can you wash your hair using both hands?

CLMT        It hurts when I put my left arm up a lot of times.

ALJ         Thank you.  Now can you go overhead with it?

CLMT        Yes sir.

*          *          *

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

ATTY        Now Mr. Dean I notice that you stood up a couple of times during this hearing, is that about the normal length of time that you're able to sit comfortably?  I'm guessing it was about maybe 10 or 15 minutes that you sat there.

CLMT        Yes.

*          *          *

ATTY        Okay.  Could you tell us when you worked for Lang Brothers?

CLMT        I think it was 2002, in May.  I went to work for 'em, worked for 'em for about a year.

ATTY        Okay.  So after West Virginia Paving you worked for Lang Brothers and also drove the shuttle bus, is that right?

CLMT        That's right.

ATTY        Okay.  What did you do for Lang Brothers?

CLMT        I drove a truck for them and did some labor work for 'em.

ATTY        Okay.  Was that basically the same type work you've been doing for West Virginia Paving?

CLMT        Yes.

*          *          *

ATTY        Okay.  Tell me about your sleep.  How much do you sleep at night at one time?

CLMT        Maybe two to three hours at the most. When I go to bed I'm awake for probably two hours.  My shoulders hurt and I usually, last night I got up had to put, I got horse liniment I put on my shoulders and that eased it some.

*       *       *

ATTY        Okay.  How about your, when you wake up at night, how long are you awake then after the two or three hours of sleep before you fall back asleep?

CLMT        Probably at least an hour.  Sometimes I'll get up and lay in the floor and try to, see if that a ease my back.

ATTY        Okay.  Does that seem to help?

CLMT        Sometimes in the floor it helps.

ATTY        Is this just on a wooden floor?

CLMT        Well I got carpet on the floor.

ATTY        Okay.  And as a result of that only two or three hours of sleep at a time. Do you find yourself tired during the day?

CLMT        Yes.

ATTY        Do you have to take naps?

CLMT        Yeah, usually around 11:00 in the day and on the afternoon around 2:00 I'll sleep for maybe an hour or so.

ATTY        Do you have to do this everyday?

CLMT        Almost every day.

ATTY          Do you find that because of not sleeping much you have trouble concentrating on things?

CLMT          Yeah, it causes that too?

ATTY          Do you have any problems with your memory?

CLMT          Sometimes I do, I've noticed it.

*         *         *

ATTY          Okay.  Do you do any chores around your house?

CLMT          About the only thing I really do is feed my dogs, like I feed them in the evenings.

ATTY          Okay.  You told the Judge that you could lift, I believe you said 15 to 20 pounds.  How often could you lift that?

CLMT          Not very often.

ATTY          Okay.  Would you be able to carry that 15 or 20 pounds very far?

CLMT          No I couldn't.

ATTY          Okay.   You mentioned also that you hunted, I believe  you said in 2002.  Was that before or after you stopped work at Snow Shoe in March?

CLMT          That was before.

ATTY          Okay.  Have you hunted since you stopped work?

CLMT          I haven't hunted any.

ATTY          Okay.  The Judge also asked you about fishing and you said that you do it I think sometimes.  Have you fished at all since 2000?

CLMT          I went out once this summer and fished.

ATTY        Okay.  All right how did you fish?

CLMT        I used.

ATTY        Were you on the bank or did you go in a boat?

CLMT        I was on the bank.

ATTY        Okay.  How long were you able to fish?

CLMT        I was probably out there, maybe an hour.

*        *        *

ATTY        Okay.  Do you have problems reaching out in front of you?

CLMT        Sometimes I do.

ATTY        Okay.  Did you ever drop things with your left or right hand because of the numbness?

CLMT        Yes I have.

ATTY        Okay.  Is that in your left or your right hand?

CLMT        My left one.

ATTY        Okay.  What type things have you dropped?

CLMT        I've dropped cups before and broke 'em.

ATTY        Okay.  How often has that happened?

CLMT        Maybe once or twice a month before.

ATTY        Okay.  You also told the judge earlier that you had some breathing problems.  Would you describe for us what kind of breathing problems you have?

CLMT        When I'm walking I can't breathe as much as I used to.  Don't seem like I can get my breath as good as I used to.

ATTY          Okay.  You also told the Judge that you tried to walk about a quarter of a mile.  Is that about the limit of your ability to walk?

CLMT          Yes, and I stop quite a few times walking that far too.

ATTY          You said during that quarter of a mile you stop?

CLMT          Yes.

ATTY          Okay.  Do you feel or ever find yourself unsteady on your feet?

CLMT          Yes I do.

ATTY          Have you ever stumbled or fallen as a result of that?

CLMT          Yes.

ATTY          Okay.  Have you, is it stumbling or falling?

CLMT          Falling.

ATTY          Okay.  Have you actually fallen down?

CLMT          Yes I have.

ATTY          And how often does that occur?

CLMT          Well maybe two or three times a week.

ATTY          Okay.

CLMT          That's why I use my cane a lot.

ATTY          Okay.  I notice that you have a cane there with you.  Do you use that most of the time, all of the time, or some of the time?

CLMT          Most of the time.

ATTY          Okay.   Is it necessary for you to use that cane?

CLMT          Yes it is.

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

VE    His past relevant work as a tar truck driver primarily Your Honor was semi-skilled and medium.  I don't the shuttle bus driver position is really relevant.

ALJ    Thank you.  He's had only one job?

VE    Yes sir, basically, yes sir.

ALJ    And the semi-skills that's required in that job, are they transferable to any other skilled or semi-skilled jobs at a lighter level and also could you consider, I'd like you to consider his age, whether or not given the age he is, would have any impact on transferability?

VE    There are light and sedentary driving positions Your Honor, that I think the skills would transfer even considering the age.  At the light level, there would be approximately 300,000 nationally, approximately thirty-eight hundred in West Virginia, and at the semi-skilled sedentary level approximately 141,000 nationally, and approximately eleven hundred in Virginia.

ALJ    That's on the transferability issues, I'd like you to credit in the first hypothetical question.   The testimony you've heard, do I need to describe it for you?

VE    No sir, I made notes.

ALJ    Do you have an opinion as to whether or not he could engage in past work activity with his (inaudible)?

VE    Based on his testimony I do not think he would be able to.  He testified that he could only sit 10 to 15 minutes before needing to either stand or move around, and there simply aren't driving positions that would accommodate that, as well as his need to take naps daily.

ALJ    That would include both his past and other vocational relevant work?

VE    That's correct Your Honor.

*        *        *

ALJ    Okay sir, I'll try to speak up.  18F is a DBS form and I'd like to recite to you a hypothetical question or two and tell you what they said.  They said that they felt that Claimant could lift occasionally 20 pounds, frequently 10 pounds, stand or sit about six hours and was unlimited in pushing and pulling, and could sit for about six hours, all those things within eight-hour parameters, work day.  With respect to his posture during a work day, they felt that he could occasionally do all the things necessary, not frequently but only occasionally.   That climbing, balancing, stooping, kneeling, crouching and crawling, not frequently but occasionally. In terms of vision they found no restriction other than the fact he wore eyeglasses.  They did point out that he should not be exposed to concentrated vibrations, fumes, dust, gases and poor ventilation.  Those were the only restrictions they placed on him.  If I were to credit what they said, could he do his past work?

VE    No Your Honor, and I think primarily because of the concentrated vibrations, and the dust, and more of those kinds of environmental issues.

*        *        *

ALJ    Let's talk about the skills you talked about that were transferable to other types of jobs.  Now, if we credit 18F, I'd like you to go back and reconsider those skills that were transferable to certain light (inaudible) function jobs, and I'd like you to tell me if you credit anything in 18F, if you think he could perform any of those transferable-type jobs?  (PAUSE) These are the jobs where his skills would be employed when they moved over from light to a

sedentary position?

VE     Your Honor, I think the, actually no, because at that level of exertion they don't exist in West Virginia, I think that would nationally. I think it would limit, Your Honor, him to those were driving positions earlier that I had discussed with a transferable skills.

ALJ    Okay let's revisit this to make sure that we're both on the same page.

VE     Right, and.

ALJ    I asked you, let me finish this point please. The past work was medium and semi-skilled, and I said well could he take any of those skills and carry them down to lighter jobs, and I believe your testimony was yes there were hundreds of thousands of light job where he can employ similar skills, that his age will not be a detriment to this job. So now I've changed it, to a hypothetical question number 22 to put the limitations down to DBS founding (inaudible) and tell me whether or not carrying those limitations with him to those other jobs could he do those jobs?

VE     Not all of them Your Honor, it would reduce those jobs significantly, again based on the vibration and the dust I think I would have to exclude the driving jobs that involve truck driving, certainly and would limit him to maybe being a chauffeur or a taxi driver. There's much less vibration in those types of positions, and there are approximately 150,000 nationally at the light level, and none in West Virginia at the light level.

ALJ    Okay, and your testimony is that those 300,000 jobs or so you found in a relative (inaudible) the different types of work now. If I credit 18F, or course my credit is testimony, you can't (inaudible) that.

VE     That's correct.

24

ALJ     Now beyond those jobs where skills would be transferred from his past (inaudible) job, just moving over into other vocationally relevant work he may have on unskilled level, given that we credit, we're moving into relevant work, would there be a significant number of jobs that would fit within the DBS restrictions?

VE     Yes Your Honor.

ALJ     All right.

VE     One example would be cashier, at the unskilled light level, approximately 840,000 nationally, approximately sixty-one hundred in West Virginia.  Another example would be assembly at the unskilled light level, approximately 491,000 nationally, approximately fifteen hundred in West Virginia.  And another example Your Honor would be miscellaneous food preparation positions, approximately 250,000 nationally and approximately twelve hundred in Virginia and that would be representative Your Honor, not exhaustive.

ALJ     Distinguish your response to finding jobs to (inaudible) state agencies felt he could do (inaudible - papers moving) hypothetical question #1.  What was there in this testimony that suggested to you these types of jobs were not being (inaudible)?

VE     He could not do these jobs based on his testimony, is that what you're saying?

ALJ     The answer is, according to his testimony that there were significant jobs he could based upon what you told us.   What specifics on that testimony led you to conclude that?

VE     The primary reason would be the need to nap twice a day for an hour.  I believe that he said that 11:00, and then around 2:00 that he napped daily, needed to nap daily for approximately two hours during the work day.

ALJ     (Inaudible).

VE    Yes.

ALJ    Thank you, your witness sir.

[EXAMINATION OF VOCATIONAL EXPERT BY CLAIMANT'S ATTORNEY]

ATTY    Yes, ma'am, with regards to the jobs which you identified, if you assumed that the restrictions in 18F were correct, you identified cashier as a possibility?

VE    Yes.

ATTY    That would require him to use his hands and fingers and arms and shoulders on a frequent basis, would it not?

VE    That's correct.

ATTY    Okay.  Have you, did you have the opportunity to review the evaluation of Robert Williams with regard to the Payload (PHONETIC) test which was performed?

VE    No, my response to that question was strictly to the hypothetical which listed unlimited pushing and pulling and then lifting.

ATTY    Okay, and in order for those jobs to be available, he would have to be unlimited in his ability to push, pull, reach and hold things, is that correct?

VE    He wouldn't necessarily have to be unlimited, but the hypothetical said that it was his ability to push and pull were unlimited.  But the jobs would not require constant pushing and pulling.

ATTY    Okay.  And with regard to the assembly worker, again in the food prep, that assumes, the only the restrictions in 18F?

VE    That's correct.

ATTY    Okay.  And if he has any restrictions greater than those in 18F I assume

that the food prep, the assembly and the cashier would be precluded?

VE          It would depend on what those additional restrictions would be.

ATTY        Okay.  And if he had restrictions in his ability in his motor coordination with regard to using his hands, would that significantly restrict his ability to perform the food preparation, the assembly and the cashier work?

VE          Okay, restrictions at what extent, would it be on reaching, handling, fingering?

ATTY        Reaching, first of all reaching.

VE          Reaching.  And you're asking specifically now about the food prep, is that?

ATTY        The food prep, the assembly line or and the cashier?

VE          Okay, all of those?

ATTY        Yes ma'am.

VE          All of those would require frequent and constant reaching, handling and fingering.

ATTY        Okay.  And if he had restrictions consistent with those found by  Mr. Williams when performing the (inaudible) Payload Test would those jobs then not be available?

VE          And I did not see the results of that testing, could you tell me what extent those limits are?

ATTY        Yes ma'am, I'll be happy to.  He performed in the first percentile on both the left and right hand.

VE          That would preclude those jobs.

ATTY          Okay.  All right.  And in the event  that  he had the, okay strike that, I'm sorry. If he were in constant pain in his low back, would that also, and those limitations indicated that he  was not able to bend or stoop on a frequent basis, would that likewise preclude the assembly line worker, food prep and cashier?

VE          Most likely it would not preclude the assembly but would the food prep and cashier.

ATTY          Okay.  And if he had the, had constant pain in his neck, would that preclude the assembly line worker, in the event that the constant pain limit his ability to reach or hold small items?

VE          Yes it would.

E.          Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•          Washes, bathes, dresses, and shaves himself (Tr. 124)

•          Prepares sandwiches, eggs, and cereal for himself (Tr. 124)

•          Does laundry and washes dishes (Tr. 125)

•          Pays bills and manages a bank account (Tr. 125)

•          Shops for food (Tr. 125)

•          Watches television for about one hour per day (Tr. 126)

•          Listens to the radio for about one hour per day (Tr. 126)

•          Visits his brother and mother for about a half hour per week (Tr. 127)

28

- Drives his car (Tr. 415)

- Went hunting in 2002 (Tr. 415)

- Walks a quarter mile per day (Tr. 416)

- Can chop wood, though not well (Tr. 419)

- Can cast a fishing line (Tr. 419)

- Takes two naps of one hour each per day (Tr. 424)

## III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in not fully crediting Claimant's testimony; (2) in failing to fully develop the record; (3) by inadequately considering the combined effects of Claimant's impairments; (4) by improperly evaluating the testimony of the Vocational Expert; and (5) by not giving controlling weight to the opinion of Dr. John Sharp.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly considered Claimant's credibility, adequately developed the record, fully considered the combined effects of Claimant's impairments, accurately evaluated the Vocational Expert's testimony, and properly gave little weight to the opinion of Dr. Sharp.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe

impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

I.

The ALJ's Evaluation of Claimant's Credibility

Claimant first argues the ALJ erred in not fully crediting his testimony regarding the disabling nature of his impairments.  Claimant essentially argues the ALJ failed to carry out the mandates of Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).  Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  Id. at 594.  If he makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.  As long as the ALJ followed the legal mandates of Craig, his factual determinations will be upheld so long as they have substantial evidence to support them.  Milburn, 138 F.3d at 528.

32

The ALJ here found Claimant suffered from the severe impairments of "degenerative disc disease with neck, shoulder and back pain, chronic obstructive pulmonary disease, residuals from a left ankle injury, and borderline intellectual functioning."  (Tr. 36).  The ALJ explicitly mentioned Craig and its holding that subjective complaints must have roots in objective findings. (Tr. 38).  He then found Claimant's subjective complaints are credible "only to the extent they are supported in the record."  (Tr. 38).  Craig called for the ALJ to "expressly consider" whether Claimant had an impairment that could cause the subjective symptoms alleged.  Craig, 76 F.3d at 596.  The Court concludes the ALJ's finding that Claimant's statements are credible "only to the extent they are supported in the record" satisfies this standard since it is in the sentence after the ALJ's citation of Craig.  (Tr. 38); Craig, 76 F.3d at 596.  The ALJ is basically stating that the impairments listed in the record could cause the symptoms alleged to the extent of the record.

The second Craig prong concerns the ALJ's determination of the credibility of Claimant's subjective complaints.  The ALJ's decision adverse to Claimant's subjective complaints has substantial evidence to support it and should thus be affirmed.  Milburn, 138 F.3d at 528.  Dr. Landis found Claimant exhibited "symptom magnification and over reaction."  (Tr. 239).  He also opined that Claimant had "no motivation to return to work at this point and is anxious to obtain a disability."  (Tr. 239).  Dr. Caudell ruled a WAIS III test she administered to Claimant invalid because he was "uninterested in testing and lacked adequate motivation."  (Tr. 334).  The ALJ also noted many of Claimant's physicians prescribed physical therapy as part of his treatment, which undercut the notion Claimant could not perform physical activities.  (Tr. 38).  Indeed, Claimant admitted during his testimony that he walks a quarter mile per day under doctor's orders.  (Tr. 416).  Furthermore, Dr. Landis determined Claimant did "not require any

additional treatment other than ongoing exercises, heat and medications to control his symptoms." (Tr. 239). Finally, the ALJ noted Claimant's daily activities contradicted the severe restrictions on everyday life Claimant alleged. (Tr. 39). Claimant is able to drive his own car and went hunting in 2002. (Tr. 415). He is able to chop wood (not well) and cast a fishing line. (Tr. 419). He admits he can lift fifteen to twenty pounds. (Tr. 417). All this evidence provides substantial support for the ALJ's conclusion that Claimant's symptoms are not credible.

The Court notes many other pieces of evidence support the ALJ's decision to not find Claimant's complaints fully credible. A physical residual functional capacity assessment conducted in April 1999 found Claimant could occasionally lift fifty pounds and frequently lift twenty five pounds. (Tr. 226). It determined Claimant had no manipulative, visual, or communicative limitations, and only few postural and environmental limitations. (Tr. 227-229). Another physical residual functional capacity assessment found Claimant had no postural limitations and had only one mild environmental limitation. (Tr. 259, 261). Furthermore, Dr. Louis Kastan found Claimant's osteoarthritis was "minimal to mild." (Tr. 283). The Court sees no need to further evaluate the evidence. It suffices to note the record more than adequately supports the ALJ's determination that Claimant's subjective symptoms were not credible.

## II.

### The ALJ's Development of the Record

Claimant next contends the ALJ erred because he failed to adequately develop the record. The Fourth Circuit has held "the ALJ has a duty to explore all relevant facts and inquire into the

issues necessary for adequate development of the record." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). Nevertheless, Claimant bears the burden of showing further evidence would aid his application. Craft v. Apfel, 1998 U.S. App. LEXIS 24674 (4th Cir.).

Although Claimant's heading and first paragraph of his second argument suggest an argument regarding development of the record, the remainder of the argument is simply an elaboration of Claimant's Craig analysis. The Court has already addressed these arguments above. Claimant does not identify what additional pieces of evidence the ALJ should have obtained. Since Claimant has simply made another Craig argument under a different heading, he has clearly failed to demonstrate the ALJ should have more fully developed the record.

III.

The ALJ's Consideration of the Combined Effects of Claimant's Impairments

Claimant argues the ALJ erred by not determining that the combined effects of Claimant's impairments warranted a finding of disabled. The ALJ has a duty to consider the combined effects of a claimant's impairments. 20 C.F.R. 404.1523; Hines v. Brown, 872 F.2d 56, 59 (4th Cir. 1989). Even if a claimant does not have a single impairment qualifying as severe under the Regulations, a combination of impairments may be found to be severe and possibly result in an award of benefits. 20 C.F.R. § 404.1523. The ALJ's findings will be upheld as long as they have substantial evidence to support them. Milburn, 138 F.3d at 528.

As mentioned above, the ALJ here found Claimant suffered from the severe impairments of "degenerative disc disease with neck, shoulder and back pain, chronic obstructive pulmonary disease, residuals from a left ankle injury, and borderline intellectual functioning." (Tr. 36). The ALJ largely addressed the combined effects of these impairments when he considered

Claimant's subjective complaints. (Tr. 38-39). The ALJ found that although Claimant complained of "pain and fatigue" and used this as a justification for reducing his daily activities, the record did not support that his impairments actually caused him extreme limitations in daily life. (Tr. 38-39). Substantial evidence supports this conclusion. Several medical reports indicate Claimant suffers from only mild symptoms. (Tr. 206, 219, 282, 283). Claimant has the ability to chop wood (though not well), drive his own car, and cast a fishing line. (Tr. 415, 419). Claimant visits his brother and mother every week. (Tr. 127). The ALJ also accounted for Claimant's severe impairment of borderline intellectual functioning by limiting him to unskilled work. (Tr. 41). The ALJ adequately considered the combined severity of these impairments.

Claimant more specifically argues the ALJ failed to consider the effects of his mental impairments in combination with his physical impairments. Claimant contends the ALJ erred when he found Claimant's mental impairments did not impose disabling limitations.

In considering Claimant's alleged impairments of acute paranoid psychosis and borderline intellectual functioning, the ALJ correctly noted the Regulations require a special technique. (Tr. 36); 20 C.F.R. § 404.1520a. Under this Regulation, if the ALJ determines a claimant has a medically determinable mental impairment, he must evaluate the functional limitations it imposes. 20 C.F.R. § 404.1520a(b-c). This evaluation should consider four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). With these considerations in mind, the ALJ should then determine if the mental impairment is severe. 20 C.F.R. § 404.1520a(d). Only if the impairment is severe should the ALJ evaluate whether it meets one of the medical listings in the Regulations. 20 C.F.R. § 404.1520a(d)(2).

The ALJ correctly stated the Regulations for mental impairments; however, he evaluated the mental impairments alleged in the wrong sequence. Errors of law by the ALJ are reviewed de novo. Milburn, 138 F.3d at 528. When evaluating Claimant's alleged acute paranoid psychosis, the ALJ stated that Claimant's impairment did not satisfy listing 12.03 of the Regulations. (Tr. 36). The ALJ concluded that because Claimant's impairment did not satisfy this listing, it was not severe. Id. The ALJ should not have evaluated whether Claimant's impairment met the listings until after he determined the impairment was severe. 20 C.F.R. § 404.1520a(d)(2). The ALJ reversed the sequence required by the Regulations by making satisfying a medical listing a prerequisite of having a severe impairment. The Regulations provide for the opposite. Id. Having a severe impairment is a prerequisite to satisfying a medical listing under 20 C.F.R. § 404.1520a(d)(2). Since the ALJ failed to first determine whether Claimant's alleged acute paranoid psychosis was severe, a remand is necessary so the ALJ may consider this issue in accordance with the Regulations. As outlined above, the ALJ should first determine whether Claimant's alleged acute paranoid psychosis presents a severe impairment.[7] 20 C.F.R. § 404.1520a(d). Only if it does should the ALJ consider if it meets one of the medical listings.

The ALJ made the same sequencing error when evaluating the severity of Claimant's borderline intellectual functioning. The ALJ determined that because Claimant satisfied the "A" criteria of 12.05 of the medical listings, his impairment was severe.[8] (Tr. 36-37). The ALJ

---

[7] The first step is to determine whether Claimant has a medically determinable impairment. 20 C.F.R. § 404.1520a(b). This step is satisfied.

[8] Paragraph "A" criteria is "a statement describing the disorder(s) addressed by the listing, or "a set of medical findings." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A. It is basically the introductory paragraph of a listing. The Regulations provide that 12.05 actually

should have first determined whether the Claimant's impairment was severe and only if it was severe whether Claimant met a medical listing. 20 C.F.R. 404.1520a(c-d). Although the ALJ determined Claimant's borderline intellectual functioning presented a severe impairment, the Court construes Claimant's brief to ask for a remand on this point as well. Claimant asserts that "each of his medical problems, in and of themselves warrant a finding of disability." Pl.'s Br. at 18. A remand on this issue may result in a finding that Claimant satisfies listing 12.05, which would entitle Claimant to disability benefits. 20 C.F.R. § 404.1520(a)(4)(iii).

Therefore, the Court finds a remand necessary on the issues of the severity of Claimant's alleged acute psychotic disorder and borderline intellectual functioning. The ALJ should follow the procedures provided in 20 C.F.R. § 404.1520a, as detailed above.

IV.

The ALJ's Evaluation of the Vocational Expert's Testimony

Claimant next asserts the ALJ failed to properly consider the testimony of the Vocational Expert. The ALJ may rely on a Vocational Expert to determine the work a claimant is capable of performing. 20 C.F.R. § 404.1560(a)(2). Hypothetical questions to the Vocational Expert should consider all the evidence in the record. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Courts should affirm the ALJ where he relies on questions that adequately reflect the claimant's impairments. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).

Claimant asserts the Vocational Expert provided testimony favorable to his case that the

---

does not have "A" criteria. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A. Nevertheless, the Court construes the ALJ's statement that Claimant met the "A" criteria of 12.05 to mean he exhibited "significantly subaverage general intellectual functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. Claimant would still have to meet one of the additional listings in 12.05 to qualify for disability under that section. Id.

ALJ ignored.  Claimant notes the Vocational Expert testified that Claimant could transfer few job skills from his past relevant work to new jobs given his limitations.  (Tr. 432).  Claimant also points out the Vocational Expert testified that if the Perdue Pegboard test performed by Dr. Williams were given credit (Tr. 189), Claimant could not perform any work.  (Tr. 435).  The Vocational Expert also testified Claimant could not return to his past relevant work based on Claimant's testimony and, though the record is unclear, seems to have suggested Claimant could not perform any work based on Claimant's testimony.  (Tr. 430, 433-34).

The issues Claimant raises here do not truly concern the Vocational Expert, but rather the ALJ's decision to credit some pieces of evidence over others.  The Vocational Expert testified that based on a physical residual functional capacity assessment from 2002, Claimant could perform a range of work.  (Tr. 433).  The Vocational Expert provided testimony more favorable to Claimant when assuming the validity of other pieces of evidence, as detailed in the preceding paragraph.  (Tr. 430, 432-34).  The ALJ chose to credit the physical residual functional capacity assessment over other pieces of evidence.  (Tr. 40-41).  Claimant disputes his decision in this regard.  As always, it must be remembered that "it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence."  Hays, 907 F.2d at 1456.  The Court will uphold the ALJ's decision as long as it is supported by substantial evidence.  Id.

Substantial evidence supports the ALJ's decision to credit the physical residual functional capacity assessment over other pieces of evidence.  First, it should be noted that although Claimant mentions the Vocational Expert's testimony that Claimant could transfer few to none of his prior work skills to other jobs, this is irrelevant since the testimony the ALJ

ultimately relied upon limited Claimant to unskilled light work. (Tr. 41, 432-33). The only remaining testimony Claimant complains the ALJ failed to consider consists of when the Vocational Expert assumes the correctness of Claimant's own testimony and the test administered by Dr. Williams. The ALJ found Claimant's subjective complaints were not credible and this decision has substantial evidence to support it. (Tr. 38-39). Dr. Landis found Claimant exaggerated his symptoms and had "no motivation to return to work." (Tr. 239). Many medical reports also indicate Claimant suffered only mild symptoms. (Tr. 206, 219, 282, 283). Regarding the severe limitations in dexterity found by Dr. Williams, that report is inconsistent with four physical residual functional capacity assessments. (Tr. 189, 228, 260, 277, 340). All four of those assessments found Claimant had no manipulative limitations. (Tr. 228, 260, 277, 340). Thus, substantial evidence supports the ALJ's decision not to credit evidence favorable to Claimant.

V.

<u>The ALJ's Consideration of Dr. Sharp's Opinion</u>

Claimant finally argues the ALJ failed to give adequate weight to the opinion of Claimant's treating physician, Dr. Sharp. The opinion of a treating physician will be given controlling weight if the opinion is (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.972(d)(2). A treating physician's opinion will be disregarded if persuasive contrary evidence exists. <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984). To decide whether an impairment is adequately supported by medical evidence, the Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508; Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990). The ultimate legal determination of a claimant's residual functional capacity always rests with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). It is the duty of the ALJ to make factual findings and resolve inconsistencies in the evidence. Hays, 907 F.2d at 1456. The decision of the ALJ only needs substantial evidence to support it in order for the Court to uphold it. Id.

Dr. Sharp's reports indicate Claimant suffers from severe impairments. Dr. Sharp found Claimant cannot sit, stand, bend, or carry. (Tr. 286). Claimant has difficulty in turning his head. Id. According to Dr. Sharp, Claimant cannot perform even sedentary work involving large amounts of sitting, only occasional walking and standing, and requiring Claimant lift not more than ten pounds. Id.

The ALJ declined to credit Dr. Sharp's opinion, finding it inconsistent with the medical record. (Tr. 39). The ALJ determined that "Dr. Sharp's opinion conflicts with the medical record as a whole, including the records of his treating physicians and the objective laboratory findings." Id. Thus, the ALJ credited other evidence in the record above Dr. Sharp's opinion and found Claimant not disabled.

Substantial evidence supports the ALJ's conclusion to not credit the opinion of Dr. Sharp, for Dr. Sharp's opinion was inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.972(d)(2). Dr. Weinstein determined Claimant suffers from only mild impairments. (Tr. 219). Dr. Kastan also found Claimant's osteoarthritis "minimal to mild." (Tr.

41

283).  In contrast to the extreme postural limitations assessed by Dr. Sharp, a physical residual functional capacity performed in October 1999 found Claimant had no postural limitations.  (Tr. 259).  Another physical residual functional capacity assessment from April 1999 determined Claimant only had postural limitations in climbing and stooping, but that he could do these occasionally.  (Tr. 227).  Two other residual functional capacity assessments found Claimant could perform postural movements occasionally.  (Tr. 276, 339).  Also contrary to Dr. Sharp's opinion is Claimant's activities of daily living.  Claimant is able to shop for food and drive his car.  (Tr. 125, 415).  He walks a quarter mile per day and can cast a fishing line.  (Tr. 416, 419).  Dr. Sharp's opinion of disabling restraints runs contrary to the overwhelming evidence of record and so the ALJ was not bound to accept it.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner so she may properly evaluate Claimant's alleged acute psychotic disorder and borderline intellectual functioning in accord with 20 C.F.R. § 404.1520a.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report

and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: October 18, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE